873 F.2d 229
 EUREKA FEDERAL SAVINGS AND LOAN ASSOCIATION; Walter
Gilliam, Plaintiffs-Appellees,
v.
AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, a
corporation, Defendant-Appellant,
and
CNA Insurance Companies, a corporation, Defendant.
 Nos. 88-1723, 88-2578.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 16, 1989.
Decided April 25, 1989.
 
 Theodore A. Boundas, James A. Skarzynski, Robert L. Suomala, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., Carol G. Perry, Kathleen R. Tichenor, Lukens, Cooper, Perry & Drummond, San Francisco, Cal., for defendant-appellant.
 Kenneth J. Philpot, and Debra S. Belga, Jackson, Tufts, Cole & Black, San Francisco, Cal., for plaintiff-appellee Eureka.
 Geoffrey D. Becker, Becker & Becker, Millbrae, Cal., for plaintiff-appellee Gilliam.
 Daniel J. Furniss and Louise E. Ma, Khourie, Crew & Jaeger, San Francisco, Cal., for intervenor-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before TANG, SKOPIL and SCHROEDER, Circuit Judges.
 SKOPIL, Circuit Judge:
 
 
 1
 This is a declaratory action brought by Eureka Federal Savings & Loan Association ("Eureka") and two of its former officers, Walter Gilliam and Allan R. Jamieson, against American Casualty Company ("American") seeking to establish the liability limits in a directors' and officers' liability insurance policy. By establishing the policy limits, Eureka intends to facilitate settlement of Eureka Fed. Sav. & Loan Ass'n v. Kidwell, 672 F.Supp. 436 (N.D.Cal.1987) ("Kidwell "). In that case, Eureka claims damages from five former officers (including Gilliam and Jamieson) for breach of fiduciary duty, negligence, mismanagement, and waste in connection with losses incurred in over 200 loan transactions.
 
 
 2
 The policy at issue states that the liability limits are "$20,000,000 each loss and $20,000,000 aggregate limit of liability each policy year for each director and officer." American asserts that the maximum liability coverage in Kidwell is $20,000,000 because the claims there constitute a single loss. Eureka contends that Kidwell involves numerous losses and the maximum liability coverage for five officers should therefore be $100,000,000.
 
 
 3
 The district court granted summary judgment in favor of Eureka, ruling that the claims in Kidwell constitute more than one loss as defined in the policy and that each loan transaction in Kidwell is a separate loss unless the Kidwell defendants can show that some loans had interrelated borrowers. American contends the district court lacked subject matter jurisdiction. Alternatively, American argues that (1) this action is barred by a "no action clause" in the policy; (2) Gilliam's claims are barred by collateral estoppel; (3) the loan losses constitute a single loss; and (4) additional discovery should have been allowed before resolution by summary judgment. We reject all of these arguments and affirm.
 
 I.
 
 4
 American contends that the district court lacked jurisdiction over this declaratory action because Eureka's claims do not present an actual case or controversy. See 28 U.S.C. Sec. 2201 (1982) (federal court may "declare the rights and other legal relations" of parties to "a case of actual controversy"). Generally, declaratory judgment actions are justiciable if "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). "Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Thus, declaratory relief is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Bilbrey by Bilbrey v. Brown, 738 F.2d 1462, 1470 (9th Cir.1984) (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)). We conclude that these conditions are met here and therefore the district court did not err in exercising its declaratory powers.
 
 
 5
 Under California law, American clearly has an obligation to make a good faith attempt to settle the claims in Kidwell. See Larraburu Bros., Inc. v. Royal Indem. Co., 604 F.2d 1208, 1210 (9th Cir.1979) (the implied covenant of good faith requires an insurer to "take reasonable action to settle a claim within the policy limits when there is a substantial likelihood of recovery against the insured of an amount in excess of policy limits should the claimant proceed to trial"); Crisci v. Security Ins. Co. of New Haven, 66 Cal.2d 425, 426 P.2d 173, 176, 58 Cal.Rptr. 13, 16 (1967) ("the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose the duty"). Eureka has attempted to settle Kidwell by making a formal settlement demand on two of the officers, Gilliam and Keuper, for $20 million less attorney's fees. American refused to consider the settlement demand because it viewed the total policy limits for all the directors and officers as $20 million and would not risk breaching its duties to other insureds by exhausting the policy limits. American's settlement posture thus indicates to us that a settlement cannot be achieved in Kidwell without a resolution in this case of the limits of liability coverage. To conclude that Eureka and its officers do not have an interest "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment" would prevent the parties from settling Kidwell prior to a prolonged and costly trial. Maryland Casualty, 312 U.S. at 273, 61 S.Ct. at 512; see ACandS, Inc. v. Aetna Casualty & Sur. Co., 666 F.2d 819, 823 (3d Cir.1981) ("The respective interests and obligations of insured and insurers, when disputed, require determination much in advance of judgment.... To delay for the sake of more concrete development would prevent the litigants from shaping a settlement strategy and thereby avoiding unnecessary costs."); Rubins Contractors, Inc. v. Lumbermens Mut. Ins. Co., 821 F.2d 671, 674 (D.C.Cir.1987) ("It seems inescapable that uncertainty over coverage would skew the settlement process....").
 
 
 6
 Our conclusion is fully supported by the recent decision in Kunkel v. Continental Casualty Co., 866 F.2d 1269 (10th Cir.1989). There, the court held that the district court had jurisdiction to issue a declaration as to the amount of insurance coverage even though the existence of coverage remained dependent upon (1) the outcome of an underlying action involving securities law violations; and (2) a determination that any liability incurred is not excepted from the terms of the policy. Id. at 1271. The court concluded there was a definite and real dispute that made settlement of the underlying litigation a "virtual impossibility" prior to the resolution of the coverage issue. Id. at 1275. A judicial declaration thus "clarifies the parties' legal relations and affords relief from the uncertainty surrounding [the insurer's] obligations...." Id. at 1276. See also Allendale Mut. Ins. Co. v. Kaiser Eng'rs, 804 F.2d 592, 594 (10th Cir.1986) ("The contingent nature of the right or obligation in controversy will not bar a litigant from seeking declaratory relief when the circumstances reveal a need for present adjudication."), cert. denied, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987).
 
 II.
 
 7
 American contends that section 7(C) of the policy is a "no action clause" that bars declaratory judgments prior to a termination by judgment or settlement of the underlying claim. Section 7(C) provides that:
 
 
 8
 No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy nor until the amount of the Directors' or Officers' obligation to pay shall have been finally determined either by judgment against the Directors or Officers after actual trial, or by written agreement of the Directors or Officers, the claimant and the Insurer.
 
 
 9
 Eureka first contends that section 7(C) does not bar an action by an insured. Courts, in determining whether to enforce a no action clause, have distinguished between actions by third parties and actions by insureds under the policy. See Paul Holt Drilling, Inc. v. Liberty Mut. Ins. Co., 664 F.2d 252, 254 (10th Cir.1981); Simon v. Maryland Casualty Co., 353 F.2d 608, 612 (5th Cir.1965). In Okada v. MGIC Indem. Corp., 608 F.Supp. 383 (D.Haw.1985), aff'd in part, rev'd in part, 823 F.2d 276 (9th Cir.1986), the district court, faced with the same clause in the same policy, rejected the insurer's claim that the no action clause barred any attempt to make the insurer advance attorney's fees for the defense of the directors. "The no-action clause merely bars actions against the insurer by third parties before final judgment or settlement." Okada, 608 F.Supp. at 387. On appeal we concluded that the liability policy imposed current duties on the insurer, including the duty to pay defense costs as incurred. Okada, 823 F.2d at 280. But see Zaborac v. American Casualty Co., 663 F.Supp. 330, 334 (C.D.Ill.1987) (rejecting Okada ). Thus Okada supports Eureka's argument that the no action clause does not bar an action against the insurer prior to termination of the underlying dispute.
 
 
 10
 Eureka also contends that the no action clause should not apply to bar declaratory relief in contrast to damages. Again, courts have drawn that distinction, holding that no action clauses do not apply to bar declaratory actions that adjudicate issues of coverage and defense. See Simon, 353 F.2d at 612; Paxton & Vierling Steel Co. v. Great Am. Ins. Co., 497 F.Supp. 573, 582 (D.Neb.1980); W & J Rives, Inc. v. Kemper Ins. Group, 92 N.C.App. 313, 374 S.E.2d 430, 434-35 (1988); Condenser Serv. & Eng'g Co. v. American Mut. Liab. Ins. Co., 45 N.J.Super. 31, 131 A.2d 409, 414, certification denied, 24 N.J. 547, 133 A.2d 395 (1957).
 
 
 11
 Finally, we note that no action clauses are intended to prevent (1) actions against the insurer for a money judgment by the injured party until the damages have been fixed by final judgment or agreed settlement; (2) nuisance suits against the insurance company; and (3) an injured party or an insured from bringing the insurance company into the underlying litigation with possible resultant prejudice. Paul Holt Drilling, 664 F.2d at 254; Simon, 353 F.2d at 612. These goals are not undermined by allowing Eureka to proceed with this declaratory action. We thus decline to apply the "no action clause" to bar an action by insureds under the policy for a declaration of liability limits, especially when the insured seek to facilitate settlement negotiations by establishing the policy limits.
 
 III.
 
 12
 American contends that Gilliam is barred from this action by virtue of his participation in Gilliam v. American Casualty Co., No. C-86-7148-RHS (N.D.Cal. April 23, 1987) ("Gilliam "). In that case, Gilliam sought compensatory damages in connection with American's alleged bad faith refusal to pay attorney's fees and costs incurred in the ongoing defense in Kidwell. The district court granted American's motion to dismiss the complaint, holding that section 7(C) of the policy "clearly and unambiguously bars any suit, by the insured against the insurer, prior to termination--by judgment or settlement--of the underlying claim against the insured...." Gilliam, No. C-86-7148-RHS, slip op. at 4-5. American contends that the issues in Gilliam and in this action are the same--whether section 7(C) of the policy bars an action by an insured against the insurer prior to termination of the underlying claim.
 
 
 13
 We conclude that Gilliam is not barred by collateral estoppel from contesting that section 7(C) of the policy applies to a declaratory action. Collateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding. Davis & Cox v. Summa Corp., 751 F.2d 1507, 1518 (9th Cir.1985). "If the decision could have been rationally grounded upon an issue other than that which the defendant seeks to foreclose from consideration, collateral estoppel does not preclude relitigation of the asserted issue." Id. at 1518-19. Gilliam involved a claim for damages rather than declaratory relief. The court in Gilliam did not consider the applicability of the clause in a declaratory action and did not hear arguments that "any suit" by an insured is precluded by the no action clause. Gilliam did not appeal the decision because he subsequently reached a settlement with American.
 
 
 14
 Further, discrepancies in amounts at issue between two actions may make application of collateral estoppel inappropriate. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979); Berner v. British Commonwealth Pac. Airlines, Ltd., 346 F.2d 532, 540-41 (2d Cir.1965) (collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and was then later sued for over $7 million), cert. denied, 382 U.S. 983, 86 S.Ct. 559, 15 L.Ed.2d 472 (1966). The damages in Gilliam involved the payment of $3,321.10 in attorney's fees plus compensatory damages. The amount in this action involves a dispute of potentially $100,000,000 in liability coverage.
 
 
 15
 Finally, it is inappropriate to apply collateral estoppel when its effect would be unfair. See Parklane Hosiery, 439 U.S. at 331 & n. 15, 99 S.Ct. at 651 & n. 15 (1979); Segal v. American Telephone & Telegraph Co., 606 F.2d 842, 845 (9th Cir.1979). The district court may have reached an erroneous conclusion in Gilliam because it disregarded Okada and other case law indicating that no action clauses do not bar actions by the insureds to recover defense costs.
 
 IV.
 
 16
 The district court granted Eureka's motion for summary judgment, holding that:
 
 
 17
 The allegations of the Kidwell Case do not constitute a single loss within the meaning of Section 4(D) of the D & O Policy, and accordingly Section 4(D) does not apply to limit coverage for the Kidwell Case to a single loss with maximum coverage of $20,000,000. The applicable policy limits for the Kidwell Case are $20,000,000 per officer and director per policy year. Each loan transaction in the Kidwell Case shall be treated as a separate loss under the D & O Policy, unless defendants in that action establish that the borrowers on different loans have a corporate, business or family relationship.
 
 
 18
 American contends the tests articulated by the district court are erroneous and are inconsistent with the policy language of section 4(D). Section 4(D) of the policy provides that "[c]laims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more Directors or Officers shall be considered a single loss...."
 
 
 19
 American claims that the alleged losses in Kidwell constitute a single loss under the policy because they resulted from an aggressive lending strategy adopted by Eureka in 1983 to reverse chronic operating losses. After federal deregulation, Eureka moved into new lending areas such as commercial lending, commercial-industrial real estate, and secondary marketing of loans. Eureka developed a comprehensive management plan to implement its new lending strategies. All of the loans involved in Kidwell were made during the period in which Eureka's plan was in effect.
 
 
 20
 The critical question is whether the losses in Kidwell arose out of the same act (the loan policy) or are otherwise sufficiently interrelated to be considered a single loss. The alleged breaches of fiduciary duty in Kidwell include funding loans without approval, failing to complete proper loan documents, failing to perfect security interests or obtain adequate collateral, funding loans in excess of approval limits to one borrower, selling participation interests with recourse to Eureka, and funding speculative loans without adequate sources of repayment or adequate risk analysis. In several instances the alleged breach involved failing to satisfy conditions attached to the loan approval by the Loan Committee and/or the Board of Directors. For purposes of summary judgment, Eureka agreed to assume that American could prove its theory of a common business plan.
 
 
 21
 In Okada, the insureds sought a declaration that the insurer had an ongoing duty to pay defense costs as incurred in the underlying litigation by the assignees of a savings & loan against its directors. Okada, 608 F.Supp. at 385-87. The policy limits were $1,000,000 for each loss. Because the insurer had already paid more than that limit, the insured argued there was more than one loss. The insurer countered that the losses must be aggregated based on the theory that they culminated in the failure of the savings & loan. The district court rejected that argument, holding that the acts in question were "distinct and dissimilar business decisions." Id. at 388. We affirmed the district court's holding that "more than one 'loss' can culminate in one overall result, First Savings & Loan's failure, but one result does not require finding only one 'loss.' " Okada, 823 F.2d at 283.
 
 
 22
 Similarly, we hold here that the fact that all loan losses arguably originated from one loan policy does not require finding only one loss. In this case there were numerous intervening business decisions that took place after the loan policy was initiated that required the exercise of independent business judgment. In many instances the arguable cause of the loan losses was something as simple as failure to perfect the security interest or failure to obtain a guarantee from the only party with substantial assets. Thus, the decision to implement the aggressive loan policy did not cause the losses, rather it was the alleged negligence on the part of the Kidwell defendants in making or approving the individual transactions.
 
 
 23
 A similar conclusion was reached in North River Ins. Co. v. Huff, 628 F.Supp. 1129 (D.Kan.1985). The court found that various loan transactions involved the same method of financing but they "occurred at separate times, involved different borrowers, were for different purposes, and had separate collateral." Id. at 1133. The court reasoned that the savings & loan's "decision to institute the loan swap program did not cause any damage, rather it was the alleged negligence on the part of the insureds in making or approving unprofitable loans." Id. at 1133-34.
 
 
 24
 We thus hold that the mere existence of an aggressive loan policy is insufficient as a matter of law to transform disparate acts and omissions made by five directors in connection with issuance of loans to over 200 unrelated borrowers into a single loss. We do not foreclose the possibility, however, that loans to separate borrowers may be aggregated as a single loss in an appropriate fact situation. In Atlantic Permanent Fed. Sav. & Loan Ass'n v. American Casualty Co., 839 F.2d 212 (4th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988), loan customers in the underlying action against a savings & loan and its directors alleged fraudulent sales tactics in connection with a home improvement loan program. For purposes of calculating the deductible amount, the court held there was only one loss and one deductible because the claims arose out of a series of interrelated acts--the planning and carrying out of the home improvement loan program. Id. at 219. See also Pennbank v. St. Paul Fire and Marine Ins. Co., 669 F.Supp. 122, 125 (W.D.Pa.1987) (four claims including wrongful repossession, false imprisonment, and personal injury constituted a single occurrence because they were done pursuant to single concerted repossession plan).
 
 V.
 
 25
 American contends the district court abused its discretion in refusing to deny or defer consideration of the summary judgment motion pending further discovery. American sought specific information to show that the Kidwell loans resulted from Eureka's aggressive lending strategy and to demonstrate similarities among the alleged wrongful acts in connection with these loans.
 
 
 26
 "When a party opposing a motion for summary judgment cannot present facts essential to justify his opposition to the motion, Fed.R.Civ.P. 56(f) allows the party to submit an affidavit stating such reasons." Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1306 (9th Cir.1986) (internal quotations omitted). The denial of a Rule 56(f) motion is reviewed for an abuse of discretion. VISA Int'l Serv. Ass'n v. Bankcard Holders of Am., 784 F.2d 1472, 1475 (9th Cir.1986).
 
 
 27
 We find no abuse of discretion here. Eureka agreed to assume all of American's allegations concerning the general management plan for purposes of the summary judgment motion. Accordingly, further discovery on that issue could not have been determinative.
 
 
 28
 AFFIRMED.