[No. B053418. Second Dist., Div. Five. Dec. 21, 1992.]

WHITTAKER CORPORATION, Plaintiff and Respondent, v.
ALLIANZ UNDERWRITERS, INC., et al., Defendants and Appellants.

**COUNSEL**

Kirtland & Packard, Robert A. Muhlbach, Ives, Kirwan & Dibble, Roger E. Marken, Christine Youker and Herbert Jung for Defendants and Appellants.

Rosenfeld, Meyer & Susman, Ronald M. Greenberg, Munger, Tolles & Olson and Cary B. Lerman for Plaintiff and Respondent.

## Opinion

**JACKSON, J.**\*—Plaintiff and respondent Whittaker Corporation (Whittaker) brought this insurance bad faith action against Whittaker's two commercial umbrella liability insurance carriers, defendants and appellants Allianz Underwriters, Inc. (Allianz) and Transcontinental Insurance Company, Inc. (Transcontinental). The question of insurance coverage within a particular policy period was bifurcated and tried by the superior court upon an agreed statement of facts.

The trial court rendered judgment for $410,000 in favor of the insured, Whittaker, against the insurers, Allianz and Transcontinental, concluding that all of the claims made by Whittaker's customers were covered under the policies issued by Allianz and Transcontinental for Whittaker's 1983 fiscal year. The insurers contend the trial court erred, and that certain claims must be allocated to policies issued for later fiscal years.

Since the issue involves interpretation of written insurance policies as applied to agreed facts, the question is one of law for this court, unbound by the trial court's determination. (*State Farm Mut. Auto. Ins. Co.* v. *Longden* (1987) 197 Cal.App.3d 226, 230-231 [242 Cal.Rptr. 726].) We reverse.

### Facts

#### Nature of Whittaker's Business and Whittaker's Liability for Property Damage

Whittaker developed and marketed a sealing compound used by beverage can manufacturing companies to line can ends. "Ends" are the round lids placed on the top of cans such as beverage cans. The sealing compound is a rubber-based chemical product applied in a liquid state to the rim of an end before the end is placed on the can body in the "seaming" process. After being applied to the end, and before the seaming of the end to the can, the sealing compound dries and forms a rubber-like gasket around the edge of the end. This gasket assists in sealing the end to the can body. "Shells" are ends which have not yet been converted. A shell is converted to an end when the opening is made. Sometimes shells are lined with compound and converted to ends on the same day as part of one overall process. Other times

---

\*Judge of the Municipal Court for the Antelope Judicial District sitting under assignment by the Chairperson of the Judicial Council.

shells are lined with compound and then stored for a period of time before being converted to ends.

Whittaker had three customers for its can end sealant, American Can Company (American Can), Ball Corporation (Ball) and Reynolds Metal Company (Reynolds). At the time these three customers "qualified" Whittaker's sealing compound for commercial use, the compound contained an anti-oxidant known as No-Nox. An anti-oxidant prevents oxidation of the compound after the compound is applied to the end and before the end is seamed to the can, so that the resulting gasket retains its elasticity. Otherwise, the gasket could turn brittle, causing potential leakage problems after the end is seamed to the can.

In 1983, Whittaker changed the anti-oxidant in its sealing compound, from No-Nox to ACD-50, believing that ACD-50 would perform the same as No-Nox. This was apparently an error. All three of Whittaker's customers complained that Whittaker's sealing compound had become brittle and caused leakage problems, but these complaints involved different time periods.

Whittaker has a fiscal year from November 1 to October 31. Whittaker's insurance policy periods coincide with its fiscal year. The fiscal year crucial to this dispute is fiscal year 1983, i.e., from November 1, 1982, to October 31, 1983.

As to one customer, American Can, there is no dispute. American Can complained in September 1983 of leakage in beverage cans lined with Whittaker's sealing compound. Allianz and Transcontinental agreed that American Can's claim be treated as a fiscal year 1983 occurrence, because the sealing compound was also sold to American Can, and damage to the can ends occurred, within fiscal year 1983.

Ball, however, did not complain until November 1984 that sealing compound it had purchased had prematurely aged on shells and on ends in its warehouse. Sealing compound involved in the Ball claim was sold by Whittaker in both fiscal year 1983 and fiscal year 1984, through June 11, 1984.

Reynolds complained in May 1985 that compound it had purchased from Whittaker, during Whittaker's fiscal year 1984, had prematurely turned brittle on ends in its warehouse.

The parties stipulate that it is impossible to determine which particular drum of compound sold to Ball or Reynolds is on any given shell or end, or

when an end was lined, or when after being lined to a shell or end, the compound turned brittle.

## Insurance Policies

Both Allianz and Transcontinental are excess insurers, providing commercial umbrella liability policies. Whittaker's "underlying fronting" policy was with Insurance Company of North America (INA) which provided coverage of $1 million per occurrence and $2 million in the aggregate, with a deductible in these same amounts. Whittaker describes this as its "underlying self retention." As to fiscal year 1983, Allianz and Transcontinental together provided excess insurance to Whittaker, on an equal pro rata sharing basis, of up to $10 million, effective for any covered occurrence which resulted in loss in excess of $1 million or when aggregate losses for covered occurrences exceeded $2 million. After fiscal year 1983, only Transcontinental provided excess insurance. Whittaker has exhausted its $2 million "self-retention" amount for fiscal year 1983.

The practical financial reason for this dispute is apparent. If, as contended by Whittaker, the Ball and Reynolds claims are also allocated to the fiscal year 1983 policies, the loss will fall on Allianz and Transcontinental, because Whittaker has satisfied its $2 million self-retention amount for fiscal year 1983. If, as contended by Allianz and Transcontinental, the Ball and Reynolds claims should be allocated to later policy periods, the loss may fall on Whittaker if Whittaker has not satisfied its $2 million self-retention amount for the later years.

The coverage, conditions and definitions of the underlying INA policy are as follows:[1]

(Basic Insuring agreement) "COVERAGE A—BODILY INJURY LIABILITY[,] COVERAGE B—PROPERTY DAMAGE LIABILITY [¶] The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of A. bodily injury or B. property damage to which this insurance applies, caused by an occurrence . . . ."

(Definition of "Property Damage") " 'Property Damage' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically

---

[1]The parties appear to agree that the Allianz policy incorporates the terms of the Transcontinental policy, and that the Transcontinental policy incorporates or is substantially similar to the agreements, definitions and conditions of the underlying INA policy.

injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

(Definition of "Occurrence") " 'Occurrence' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

## DISCUSSION

■ The issue in this case is whether the Ball and Reynolds claims, which arose after Whittaker's fiscal year 1983, are nevertheless covered by the fiscal year 1983 insurance policies of Allianz and Transcontinental. Whittaker contends, and the trial court agreed, that the Ball and Reynolds claims are covered by the 1983 policies, on the ground that Whittaker's 1983 decision to change anti-oxidants is the relevant "occurrence" for coverage purposes.

We reverse. Whittaker's theory is erroneous because it confuses two distinct questions. The issue here is whether there was a covered injury within the policy period. Whittaker erroneously attempts to apply case law relating to the "per occurrence" limitation of liability for a covered injury.

The basic insuring agreement promises to pay all sums which the insured shall become legally obligated to pay as damages because of "property damage." The definition of property damage requires that the damage occur "during the policy period."

For the purpose of determining whether there was *coverage within the policy period,* it is well established that the time of the relevant "occurrence" or "accident" is not when the wrongful act was committed but when the complaining party was actually damaged. (*Schrillo Co.* v. *Hartford Accident & Indemnity Co.* (1986) 181 Cal.App.3d 766, 773 [226 Cal.Rptr. 717]; *Hallmark Ins. Co.* v. *Superior Court* (1988) 201 Cal.App.3d 1014, 1017 [247 Cal.Rptr. 638].) In the policies issued in 1983, Allianz and Transcontinental obligated themselves to pay only for property damage occurring during the policy period. If Whittaker's theory were accepted, Allianz and Transcontinental could be held liable for damage occurring decades into the future from Whittaker's 1983 decision to change its product.

■ Whittaker misplaces reliance upon cases interpreting "occurrence" for the purpose of an insurer's *limitation of liability* to a certain amount for

each covered occurrence.[2] For *that* purpose, occurrence has generally been held to mean the underlying cause of the injury, rather than the injury or claim itself; otherwise, the insurer's effort to limit its liability per occurrence would be substantially weakened.[3]

The *number* of relevant occurrences for the purpose of interpreting the per occurrence limitation of liability is different from the question of *when* the relevant occurrence happens for the purpose of determining if there is coverage at all, or whether coverage should be allocated to a particular policy period. (Compare Annot., What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence (1988) 64 A.L.R.4th 668 with Annot., Event as Occurring Within Period of Coverage of "Occurrence" and "Discovery" or "Claims Made" Liability Policies (1985) 37 A.L.R.4th 382.) Ironically, this distinction is recognized in the case on which Whittaker and the trial court most strongly relied, *Champion Internat. Corp.* v. *Continental Cas. Co.*, *supra*, 546 F.2d at page 506. The insured, Champion International Corporation, sold vinyl covered plywood panels which were installed in houseboats, house trailers, motorhomes and campers. Fourteen hundred vehicles were damaged when the vinyl covering peeled off after installation. As stated in the district court opinion, *"during 1969 and 1970, when it was discovered that many of the panels were defective*, Champion was insured under two policies: [a primary comprehensive general liability policy issued by Liberty and an umbrella excess policy issued by Continental]." (400 F.Supp. at p. 979, italics added.) The excess insurer, Continental, disputed how many occurrences were involved, attempting to invoke the insured's $5,000 per occurrence deductible and to defeat the primary insurer's $100,000 per occurrence limit of liability. (*Id.* at p. 980.) In affirming the district court's determination that for this purpose there was one occurrence rather than 1,400 occurrences, the Second Circuit Court of Appeals drew the distinction: "Whether the property damage occurred *during* the policy period is a factual question which was resolved in Champion's favor below." (546 F.2d at p. 506, italics in original.)

Another of the cases cited by Whittaker, *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.*, *supra*, 676 F.2d at pages 61-62, also explains this distinction.

---

[2]Sometimes the "per occurrence" limitation of liability arises in a variant context, which is still analytically the same, e.g., whether the insured's per occurrence deductible or self-insured retained limit applies, or whether a primary insurer's per occurrence limit of liability applies so as to invoke the liability of an excess insurer for a covered risk.

[3]Whittaker cites, e.g., *United Services Automobile Assn.* v. *Baggett* (1989) 209 Cal.App.3d 1387, 1393 [258 Cal.Rptr. 52]; *Champion Internat. Corp.* v. *Continental Cas. Co.* (S.D. N.Y. 1975) 400 F.Supp. 978, affd. (2d Cir. 1976) 546 F.2d 502; *Union Carbide Corp.* v. *Travelers Indemnity Co.* (W.D. Pa. 1975) 399 F.Supp. 12; *Cargill, Inc.* v. *Liberty Mut. Ins. Co.* (D.Minn. 1979) 488 F.Supp. 49, affd. (8th Cir. 1980) 621 F.2d 275; *Owens-Illinois, Inc.* v. *Aetna Cas. & Sur. Co.* (D.D.C. 1984) 597 F.Supp. 1515; *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.* (3d Cir. 1982) 676 F.2d 56.

For the purpose of interpreting the per occurrence $25,000 deductible, the court looked to the underlying proximate cause. (*Id.* at p. 61 and fn. 11.) For the distinct purpose, however, of determining whether the occurrence took place within the policy period, the court said, "[w]hile the 'cause' test is appropriate for determining whether there is a single occurrence or multiple occurrences, it is not applicable in determining when an occurrence takes place. We hold that the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place. 'There can be no question but that the aspect of the occurrence which must take place within the policy period . . . is the "result," that is, the time when the accident or injurious exposure produces personal injury.' " (*Id.* at pp. 61-62.)

The point is further illustrated in a case both sides cite, *Uniroyal, Inc.* v. *Home Ins. Co.* (E.D.N.Y. 1988) 707 F.Supp. 1368. In *Uniroyal*, the court engaged in two distinct analyses. For the purpose of interpreting the insured's per occurrence deductible, the court's "occurrence analysis" focused on the underlying events leading to the injury. (*Id.* at pp. 1379-1387.) However, in determining which policy period was applicable, the court engaged in a separate "trigger of coverage" analysis. (*Id.* at pp. 1387-1390.) The court said, "[t]he policy is invoked or 'triggered,' when the time of the injury is within the effective dates of the policy; the time of the 'occurrence' producing the injury is irrelevant to the triggering of a policy." (*Id.* at p. 1387.)

Finally, this distinction is explained in a case cited by appellant Allianz, *Michigan Chemical Corp.* v. *American Home Assur. Co.* (6th Cir. 1984) 728 F.2d 374, 379, where the court said, "The vast majority of courts . . . have concluded that although injury must be suffered before an insured can be held liable, the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims. . . . The number and timing of injuries is relevant in addressing the distinct question of the policy period to which each injury will be assigned." The court further commented, "The cause standard, however, governs only the *number* of occurrences; it is irrelevant in determining when and where an occurrence happens. . . . Consequently, using the cause test in order to calculate the number of occurrences is perfectly consistent with looking to the time and place of injury in order to decide when and where an occurrence or occurrences takes place for purposes of either applying a products liability provision or assigning a claim to a particular policy period." (*Id.* at p. 382, italics in original; see also *American Home Assur. Co.* v. *Dykema, Gossett, et al.* (7th Cir. 1987) 811 F.2d 1077, 1084; *Chemstar, Inc.* v. *Liberty Mutual Ins. Co.* (C.D.Cal. 1992) 797 F.Supp. 1541, 1547 fn. 11.)

## Application to This Case

 Thus for the purpose of determining whether there was coverage of the Ball and Reynolds claims under the fiscal year 1983 insurance policies, the relevant occurrence is the time when Ball and Reynolds suffered property damage. (*Schrillo Co. v. Hartford Accident & Indemnity Co., supra,* 181 Cal.App.3d at p. 773.) This did not happen until after the 1983 insurance policies expired.

There is no possibility that Reynolds suffered property damage in fiscal 1983, because Reynolds did not even purchase sealing compound from Whittaker until Whittaker's fiscal year 1984.

Ball purchased Whittaker's sealing compound in both fiscal year 1983 and fiscal year 1984. Ball did not complain until November 1984 (fiscal year 1985). The parties stipulated that it is impossible to determine which particular drum of compound sold to Ball is on any given shell or end, or when an end was lined, or when after being lined to a shell or end, the compound turned brittle. The burden of proof is on Whittaker, the insured, to prove that an event is within the scope of coverage. (See *Royal Globe Ins. Co. v. Whitaker* (1986) 181 Cal.App.3d 532, 537 [226 Cal.Rptr. 435].) In light of the stipulation, Whittaker cannot show that Ball suffered property damage in fiscal 1983.

Whittaker contends that the mere shipment of some sealing compound to Ball in fiscal 1983 constituted damage because the drums containing the product were "placed on [Ball's] property," citing *American Empire Surplus Lines Ins. Co. v. G. E. Leach Construction* (1990) 223 Cal.App.3d 226, 229 [272 Cal.Rptr. 704]. The *American Empire* case involved "the construction of an encroaching building which is, of course, in the nature of a permanent trespass," a completely different situation.

Whittaker also misplaces reliance on *Fireman's Fund Ins. Co. v. Aetna Casualty & Surety Co.* (1990) 223 Cal.App.3d 1621 [273 Cal.Rptr. 431], where a building suffered property damage when its concrete exterior began to deteriorate during the first policy period but progressively worsened during a later policy period. In *Fireman's Fund,* the damage was actually manifested and discovered during the first policy period. (*Id.* at pp. 1623, 1625.)

Whittaker also refers to the definition of "occurrence" as "including continuous or repeated exposure to conditions, which results in . . . property damage." In this case, however, the conditions of continuous and repeated

exposure would mean the sealing compound's application to shells or ends, following which the compound, with a defective anti-oxidant, became brittle upon exposure to the air. As discussed, *ante*, Whittaker cannot show that these conditions occurred as to Ball and Reynolds within the 1983 policy period.

Therefore, the judgment determining that the Ball and Reynolds claims were covered by the Allianz and Transcontinental 1983 policies is erroneous.

## DISPOSITION

The judgment is reversed and the cause remanded for further proceedings as provided by the parties' stipulation. Costs on appeal are awarded to appellants Allianz and Transcontinental.

Boren, Acting P. J., and Grignon, J., concurred.

A petition for a rehearing was denied January 19, 1993, and respondent's petition for review by the Supreme Court was denied April 14, 1993.