**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

HAWTHORNE SAVINGS F.S.B.;
HAWTHORNE FINANCIAL
CORPORATION,
　　　　　　*Plaintiffs-Appellees,*

　　　　　　v.

RELIANCE INSURANCE COMPANY OF
ILLINOIS,
　　　　　　*Defendant-Appellant.*

No. 03-55548

D.C. No.
CV-99-13119-
DT(AJW)

HAWTHORNE SAVINGS F.S.B.;
HAWTHORNE FINANCIAL
CORPORATION,
　　　　　　*Plaintiffs-Appellees,*

　　　　　　v.

M. DIANE KOKEN, Insurance
Commissioner of the
Commonwealth of Pennsylvania,
in her capacity as Liquidator of
Reliance Insurance Company,
　　　　　　*Intervenor-Appellant,*

RELIANCE INSURANCE COMPANY OF
ILLINOIS,
　　　　　　*Defendant.*

No. 03-55611

D.C. No.
CV-99-13119-DT

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
December 6, 2004—Pasadena, California

629

Filed August 24, 2005
Amended January 13, 2006

Before: James R. Browning, Harry Pregerson, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

## COUNSEL

W. Wendell Hall and Rosemarie Kanusky, Fulbright & Jaworski L.L.P., San Antonio, Texas, Claudia Morehead and Robert S. Schulman, Fulbright & Jaworski L.L.P., Los Angeles, California, and Oscar Rey Rodriguez, Fulbright & Jaworski L.L.P., Dallas, Texas, for the defendant-appellant.

Pamela H. Woldow, Chief Counsel, Insurance Department, Commonwealth of Pennsylvania, Harrisburg, Pennsylvania, for the intervenor-appellant.

Jeffrey A. Tidus and David P. Crochetiere, Baute & Tidus LLP, Los Angeles, California, for the plaintiffs-appellees.

## ORDER

The Opinion filed on August 24, 2005 and appearing at 421 F.3d 835 (9th Cir. 2005) is hereby amended as follows:

1) 421 F.3d at 852, Slip Op. p. 11371, third to last line: after "state court do" add "under the Uniform Insurers Liquidation Act (UILA), CAL. INS. CODE §§ 1064.1-.12"

2) 421 F.3d at 852, Slip Op. p. 11372, lines 5-6: replace "Uniform Insurers Liquidation Act (UILA), CAL. INS. CODE §§ 1064.1-.12" with "UILA"

3) 421 F.3d at 856, Slip Op. p. 11378, line 16: after "stay its proceedings" add "under the UILA"

## OPINION

BERZON, Circuit Judge:

"[F]ederal courts routinely confront the conflict between their exercise of federal jurisdiction and state laws establishing exclusive claims proceedings for insurance insolvencies." *Callon Petroleum Co. v. Frontier Ins. Co.*, 351 F.3d 204, 209 (5th Cir. 2003).[1] These appeals present such a conflict.

Hawthorne Savings, F.S.B. ("Hawthorne") sued the Reliance Insurance Company of Illinois ("Reliance-Illinois") in California state court, alleging various California state-law contract-based claims. Reliance-Illinois removed the suit to federal court on the basis of diversity. Shortly thereafter, Reliance[2] was placed in rehabilitation proceedings, and later in liquidation proceedings, in the Commonwealth Court of Pennsylvania.[3]

The district court proceeded with this suit. The jury entered a verdict in Hawthorne's favor and awarded $950,000 in damages. Reliance now appeals the final judgment. Reliance's principal argument is that the district court erred in continuing to exercise jurisdiction over Hawthorne's suit once the reha-

---

[1]Insurance companies are expressly excluded from federal bankruptcy laws. *See* 11 U.S.C. § 109(b)(2)-(3).

[2]For convenience, we hereafter refer to Reliance-Illinois and Reliance interchangeably as "Reliance," except where the distinction between the two entities matters.

[3]The Commonwealth Court of Pennsylvania has original jurisdiction over any civil action or proceeding arising under Article V of the Pennsylvania Insurance Department Act, 40 PA. CONS. STAT. §§ 221.1-.63, including the liquidation proceedings at issue here. *See* 42 *id.* § 761(a)(2)-(3).

bilitation proceedings began, because (1) it lacked jurisdiction or (2) various abstention and comity-based doctrines required the court to stay its hand. In addition, Reliance challenges the district court's order requiring it to post a $1.1 million litigation bond, and contests one of the jury instructions used at trial. For the reasons that follow, we affirm on all claims in No. 03-55548 and dismiss No. 03-55611 for failure to prosecute.

## I.   Background

This case has its roots in one of the more infamous legal proceedings of the 1990s, the prosecution of O.J. Simpson. In 1995, Simpson, having incurred substantial litigation costs and fees as a result of his prosecution and facing further costs and fees for his civil trial, took out a loan from Hawthorne secured with mortgages on his Los Angeles-area residence ("Rockingham") and a townhouse in New York. During Simpson's civil trial in 1997, the Rockingham property went into default, leading to a widely publicized foreclosure sale. One potential bidder, Jeff Bazyler, contacted Hawthorne Savings to obtain funds for a bid on the property. Hawthorne's President, Scott Braly, personally approved a loan for $2.6 million in cash, charging substantial fees and interest.[4]

After the period in which Bazyler could have rescinded the loan without penalty passed, Braly decided to have Hawthorne bid against Bazyler at the foreclosure sale. Toward that end, Hawthorne sent Bazyler a letter informing him that it reserved the right to bid on the property. Braly also denied Bazyler's request for an additional $200,000, even though there was no doubt that Bazyler had the necessary collateral for the extra funds. Hawthorne outbid Bazyler at the foreclosure sale, purchasing the property for $2,631,000, almost $1.2

---

[4]Except where otherwise indicated, the facts giving rise to the original settlement between Bazyler and Hawthorne are undisputed and were stipulated at trial.

million under its market price. Hawthorne then sold the property for $3.7 million.

Bazyler subsequently filed suit against Hawthorne and Braly, alleging deceit, constructive fraud, and constructive trust, in violation of California Civil Code sections 1709, 1573, and 2224, respectively. Eventually, Hawthorne settled on its own behalf and Braly's, agreeing to pay Bazyler $700,000 from its own accounts.

Enter Reliance. Hawthorne was insured by a "Directors and Officers Liability" policy issued by Reliance-Illinois, which later merged into its parent, the Reliance Insurance Company ("Reliance"). The policy had applicable coverage limits of $10 million, with a "self-insured retention" of $100,000; Hawthorne had to incur legal expenses of at least that amount before the policy would kick in. Reliance was informed of the *Bazyler* action, and participated in some of the mediation sessions. Until the settlement, Reliance never indicated that it would refuse to pay on any claim arising out of the case. Yet, once the parties settled, Reliance, citing various provisions of California law pertaining to intentional misconduct, compensated Hawthorne for only $10,181.59 of the $364,559.53 in legal fees incurred. Adding together the $700,000 settlement and the fees Reliance refused to cover, Hawthorne was out of pocket for $1,054,377.94.

In late 1999, Hawthorne filed this lawsuit against Reliance in the California Superior Court for Los Angeles County, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. The suit sought a declaratory judgment to the effect that Hawthorne's policy with Reliance obligated the insurer fully to defend Hawthorne and to pay all of Hawthorne's fees and expenses arising out of the *Bazyler* litigation. The complaint also asked for damages arising from the breach of contract and breach of the implied covenant of good faith and fair dealing.

Reliance removed the action to the U.S. District Court for the Central District of California under the diversity removal provision of 28 U.S.C. § 1441(b). In late 2000, the district court granted Reliance's motion for summary judgment as to Hawthorne's second claim. The first and third claims, however, proceeded to trial.

In advance of the trial, and in light of the deteriorating financial condition of the parent Reliance, into which Reliance-Illinois had by then merged, Hawthorne moved, in early 2001, for an order requiring a $1.1 million bond to secure payment of any judgment rendered in Hawthorne's favor. The district court granted the motion. Reliance thereupon posted an indemnity bond in which the Insurance Company of the State of Pennsylvania obligated itself to Hawthorne for no more than $1.1 million should Hawthorne prevail in its suit against Reliance.[5]

Shortly thereafter, M. Diane Koken, the Insurance Commissioner of the Commonwealth of Pennsylvania, commenced rehabilitation proceedings on behalf of Reliance's creditors in the Commonwealth Court. *See Koken v. Reliance Ins. Co.*, 784 A.2d 209 (Pa. Commw. Ct. 2001) (per curiam). The petition for rehabilitation, which the Pennsylvania court granted on May 29, 2001, placed Reliance under Koken's regulatory supervision. *See* 40 Pa. Cons. Stat. § 221.15(c).

In light of the rehabilitation order issued by the Pennsylvania Commonwealth Court, Reliance moved to exonerate the bond. The district court denied the motion. The following day the Pennsylvania Commonwealth Court terminated the rehabilitation proceedings, declared Reliance insolvent, and granted Koken's petition to liquidate Reliance. Koken was appointed as the liquidator of Reliance's assets. *See id.* § 221.20(c). The Commonwealth Court's liquidation order provided, inter alia, that: "All actions, including arbitrations

---

[5]The record is silent as to how the bond was secured.

and mediations, currently pending against Reliance in the courts of the Commonwealth of Pennsylvania or elsewhere are hereby stayed."

While the liquidation proceedings were ongoing, Reliance moved to dismiss the Hawthorne lawsuit on the ground that the liquidation order vested the Pennsylvania Commonwealth Court with "exclusive" jurisdiction over claims against Reliance and enjoined any continued prosecution of claims against Reliance in other fora. The district court denied the motion to dismiss. Koken then sought leave to intervene for the limited purpose of contesting subject-matter jurisdiction. The district court denied the intervention motion as untimely.[6]

Eventually, the case went to trial, culminating in January 2003 in a jury verdict for $950,000 in favor of Hawthorne. After the verdict, the district court granted Hawthorne's motion to enter judgment on its claim for declaratory relief and provided that an additional $343,018.36 in pre-judgment interest would be added to the jury verdict, for a total award to Hawthorne of $1,293,018.36 (not including post-judgment interest and costs). From this final order Reliance timely appeals.

## II.   The District Court's Exercise of Jurisdiction

Reliance's central contention is that the district court

---

[6]Although Koken filed her own notice of appeal, we consolidated her appeal (No. 03-55611) with Reliance's (No. 03-55548). Neither she nor Reliance has here challenged the district court's denial of her motion to intervene under Federal Rule of Civil Procedure 24. Counsel for Reliance acknowledged at oral argument that neither Reliance nor Koken has presented any argument concerning why Koken should have been allowed to intervene. We therefore dismiss No. 03-55611 for failure to prosecute. *See* 9TH CIR. R. 42-1; *see also* FED. R. APP. P. 3(a)(2) ("An appellant's failure to take any step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal.").

should not have continued to exercise jurisdiction over this suit once the Commonwealth Court commenced liquidation proceedings. Although we consider each of its jurisdictional and abstention arguments supporting this contention in turn, we begin with some preliminary observations:

This lawsuit is a simple state-law contract claim between private parties. Federal jurisdiction is grounded solely on the diversity of citizenship of the parties. The case only ended up in federal court because Reliance, the party now arguing against federal jurisdiction, removed it from state court.

Under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), " 'federal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law.' " *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th Cir. 2003) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)). There is no question, nor do the parties contest, that the merits of Hawthorne's suit against Reliance turn on questions of California substantive law. Moreover, Congress has disavowed any significant and overriding federal interest in insurance insolvencies, exempting insolvent insurers from the protection of federal bankruptcy laws. *See* 11 U.S.C. § 109(b)(2)-(3). The Supreme Court reiterated this point in 1993 in affirming "the supremacy of the States in the realm of insurance regulation," *U.S. Dep't of the Treasury v. Fabe*, 508 U.S. 491, 500 (1993). A state-law contract-based claim against an insurance company generally, and an insolvent insurer specifically, is thus governed entirely by state substantive law.

In consequence, as we summarized in a largely analogous case,

> There are no federal questions involved in this litigation. Further, it is undisputed by the parties that the federal district court, sitting in diversity, would apply the substantive law of Arizona. Thus, the fed-

eral court would sit in the same posture as the Arizona state court[,] and there should be no different result in the federal proceedings than would have been achieved in the state court proceeding.

*Tucker v. First Md. Sav. & Loan, Inc.*, 942 F.2d 1401, 1406 (9th Cir. 1991). This animating principle — that we are, in effect, to decide how a California state court would handle the legal questions at issue — is central to our resolution of this appeal.

The particular principles of preemption, abstention, and comity on which Reliance would have us rely, have at their core, however, concerns primarily grounded in federalism and federal/state relations. This case, in contrast, concerns the application of the law of different states to insolvent insurance companies. It is therefore difficult to see how concerns warranting resort to principles of federalism, in the sense of federal-state relations, are implicated in this case. Only if we were inclined, solely because this case was removed to federal court, to reach a result different from the one a California court would reach with regard to the impact of the Pennsylvania insolvency proceedings would traditional issues of federalism arise, requiring resolution.

With these observations in mind, we turn to the specifics of the parties' jurisdictional and abstention arguments.

### A.   McCarran-Ferguson

[1] Enacted in 1945, the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 *et seq.*, "was an effort by Congress to protect states' primary regulatory role over the insurance industry." *Elliot v. Fortis Benefits Ins. Co.*, 337 F.3d 1138, 1142 n.3 (9th Cir.), *cert. denied*, 540 U.S. 1090 (2003); *see also Fabe*, 508 U.S. at 500. Toward that end, the Act includes an express reverse preemption provision, 15 U.S.C. § 1012(b). That section provides that "[n]o Act of Congress shall be construed to

invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." *See Humana Inc. v. Forsyth*, 525 U.S. 299, 306-07 (1999).

Reliance argues that the McCarran-Ferguson Act bars the federal diversity statute, 28 U.S.C. § 1332, from preempting or otherwise interfering with Pennsylvania's rehabilitation and liquidation statutes. The theory is that federal jurisdiction necessarily "impairs" the operation of Pennsylvania's state-law liquidation regime. Therefore, Reliance contends, McCarran-Ferguson divests the district court of jurisdiction over this suit, at least while liquidation proceedings are ongoing in Pennsylvania.

**[2]** Although the interplay between McCarran-Ferguson and the federal diversity statute, 28 U.S.C. § 1332, raises a question of first impression in this circuit, the Fourth Circuit, in a persuasive opinion concerning a case with similar facts, explained why Reliance's position is ultimately unconvincing. *Gross v. Weingarten*, 217 F.3d 208 (4th Cir. 2000), confronted the argument that Virginia's insurance insolvency laws necessarily reverse-preempted the federal diversity jurisdiction statute because of McCarran-Ferguson. The Fourth Circuit rejected this position, stating:

> We are skeptical that Congress intended, through the McCarran-Ferguson Act, to remove federal jurisdiction over every claim that might be asserted against an insurer in state insolvency proceedings. If nothing else, the argument proves too much, for it would operate to divest exclusively federal jurisdiction as effectively as it would diversity jurisdiction, leaving many plaintiffs with no forum in which to assert their federal rights. In any event, we do not believe that concurrent federal jurisdiction over the defendants' counterclaims threatens to "invalidate,

impair, or supersede" (as those terms are used in the McCarran-Ferguson Act) Virginia's efforts to establish a single equitable proceeding to liquidate or rehabilitate insolvent insurers. As we have already noted, the Commission has had exclusive jurisdiction of the property of Fidelity Bankers — the res — since May 13, 1991. And, as we have also emphasized, the defendants would still have to present claims to the Commission in order to recover on any judgment in their favor. The claims based on that judgment would be satisfied subject to the terms of the rehabilitation plan and the priorities established by Virginia law. Thus, the state forum retains exclusive jurisdiction over the liquidation of Fidelity Bankers and the disposition of its assets.

*Id.* at 222 (citations omitted). The Fourth Circuit's logic is persuasive. The state forum here, that of Pennsylvania, retains exclusive jurisdiction over the liquidation of Reliance and the disposition of its assets.

Further, Reliance's argument would not bar the exercise of federal jurisdiction against only insolvent insurers. By necessary implication, Reliance's reading of McCarran-Ferguson would bar the exercise of federal jurisdiction in any lawsuit where the exercise of such jurisdiction implicates any state law concerning the "business of insurance." The Tenth Circuit long ago rejected this position and more recently reaffirmed its rejection, and the Fifth Circuit has agreed. *See Atl. & Pac. Ins. Co. v. Combined Ins. Co. of Am.*, 312 F.2d 513, 515 (10th Cir. 1962) ("The McCarran Act serves to limit the authority of federal regulatory agencies as to practices in the insurance business in the face of state acts and in the absence of specific federal law, but it does not follow that there is thereby a modification of diversity jurisdiction of the federal courts." (citation omitted)); *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 702 (10th Cir. 1988) ("[T]he policy of the McCarran-Ferguson Act was to leave the regulation of insurers to the

states, it did not intend to divest federal courts of the right to apply state law regarding the regulation of insurers in appropriate diversity proceedings."); *Martin Ins. Agency, Inc. v. Prudential Reinsurance Co.*, 910 F.2d 249, 254 (5th Cir. 1990) ("The McCarran-Ferguson Act, 15 U.S.C. §§ 1011-15, did not remove diversity jurisdiction from the federal courts in insurance matters . . . .").

[3] To these analyses, we add the following point: The necessary question in cases such as this one is whether operation of the diversity jurisdiction statute actually "invalidate[s], impair[s], or supersede[s]" the state's liquidation efforts. If it is the exercise of federal jurisdiction itself that impairs Pennsylvania's liquidation efforts — *viz.*, if Reliance is correct that the McCarran-Ferguson Act bars the district court's exercise of jurisdiction — then we would be obligated to remand this suit to the California Superior Court, rather than dismiss it; the absence of subject-matter jurisdiction would defeat Reliance's removal of this case to federal court. *See* 28 U.S.C. § 1447(c).

[4] As a consequence of the remand option, Reliance's McCarran-Ferguson Act argument could have merit only if its removal of this case, itself, impaired the Pennsylvania liquidation proceedings. Even if we could allow a voluntary invocation of federal jurisdiction to preclude the litigation of a case properly brought in state court, a proposition the Supreme Court recently rejected in the context of state sovereign immunity,[7] the result here is no different, as we later explain, than the result a California state court would reach. The removal itself therefore could not possibly impair the Pennsylvania liquidation proceedings.

---

[7]In *Lapides v. Board of Regents of the University System of Georgia*, 535 U.S. 613 (2002), the Court held that a state could not invoke its Eleventh Amendment sovereign immunity to bar federal litigation of state-law damages claims when the state had voluntarily removed the claims to federal court. *Id*. at 616.

**[5]** We therefore hold that 28 U.S.C. § 1332 is not reverse-preempted by the McCarran-Ferguson Act.

### B.    Abstention

A somewhat harder issue is Reliance's argument that the district court was bound to abstain.[8] As the Second Circuit has suggested, in a diversity case, "the reasons for abstention must be strong to justify a decision to remand a case properly removed from state court." *Minot v. Eckardt-Minot*, 13 F.3d 590, 593 (2d Cir. 1994); *cf. Meredith v. City of Winter Haven*, 320 U.S. 228, 237 (1943) (suggesting that abstention is generally disfavored in diversity cases). The reasons must be all the more compelling where it is the defendant — the party that removed the case — urging abstention.

In *Gross*, the Fourth Circuit suggested that there are circumstances in which abstention might be appropriate to avoid federal court interference with state insurance insolvency laws:

> We realize that in some limited circumstances, the exercise of federal diversity jurisdiction might in fact impair state laws establishing exclusive claims proceedings for insurance insolvencies. This potential for conflict, however, is already contemplated in the principles governing the exercise of jurisdiction, which provide a safety valve through the pragmatic doctrine of abstention.

---

[8]Whether the requirements for abstention have been met is a question of law reviewed de novo, although the district court's decision whether to abstain under *Burford* or *Colorado River* is reviewed for an abuse of discretion. *See S. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 805 (9th Cir. 2002); *see also Green v. City of Tucson*, 255 F.3d 1086, 1093 & n.10 (9th Cir. 2001) (en banc), *overruled in part on other grounds by Gilbertson v. Albright*, 381 F.3d 965 (9th Cir. 2004) (en banc).

*Gross*, 217 F.3d at 222. Some of our other sister circuits have also embraced the applicability of abstention to lawsuits against insolvent insurance companies. *See, e.g.*, *Callon Petroleum*, 351 F.3d at 208-09 & n.8; *Prop. & Cas. Ins. Ltd. v. Cent. Nat'l Ins. Co. of Omaha*, 936 F.2d 319 (7th Cir. 1991); *Martin Ins. Agency, Inc.*, 910 F.2d 249; *Grimes*, 857 F.2d 699; *Lac D'Amiante du Quebec, Ltee. v. Am. Home Assurance Co.*, 864 F.2d 1033 (3d Cir. 1988). In particular, courts facing abstention arguments similar to those that Reliance raises here have looked to the principles enunciated in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), giving rise to the abstention doctrine of the same name. *See, e.g.*, *Prop. & Cas. Ins. Ltd.*, 936 F.2d at 321 ("*Burford* has become the doctrine of choice in analyzing whether to abstain in favor of state insurance liquidation and rehabilitation proceedings."); *see also Callon Petroleum*, 351 F.3d at 209.

This court, however, has already declined to abstain under *Burford* in *Tucker*, a case with remarkably similar facts. We conclude that *Tucker* is controlling precedent. To help explain why *Tucker* compels rejection of Reliance's abstention argument, we begin with the basic principles of *Burford* abstention.

### 1. *Burford* Abstention Generally

The *Burford* abstention doctrine arose from a case challenging actions of the Texas Railroad Commission during the late 1930s. The Sun Oil Company brought a diversity suit in federal district court, challenging the Railroad Commission's grant of certain new oil drilling permits, or, in the alternative, seeking an injunction against operation of the new oil wells.

[6] The Supreme Court approved the district court's dismissal of the case as properly belonging in Texas state court. Emphasizing the complexities of the Texas regulatory scheme and the fact that "the Texas legislature has established a system of thorough judicial review by its own state courts," *Bur-*

*ford*, 319 U.S. at 325, the Court found conclusive the extent to which "Texas courts . . . alone have the power to give definite answers to the questions of state law posed in these proceedings." *Id*. Thus, "[c]oncentration of judicial supervision of Railroad Commission orders permits the state courts, like the Railroad Commission itself, to acquire a specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in this field." *Id*. at 327. Citing the "confusion" that had resulted from the simultaneous exercise of federal equity jurisdiction and state-court jurisdiction over the propriety of the Railroad Commission's orders, the Court concluded that "[t]hese questions of regulation of the industry by the state administrative agency . . . so clearly involve[ ] basic problems of Texas policy that equitable discretion should be exercised to give the Texas courts the first opportunity to consider them." *Id*. at 332.

As the Supreme Court has emphasized, "*Burford* represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)) (further internal quotation omitted). Given that admonition, it is critical to examine the scope of that "extraordinary and narrow exception" with care, rather than applying it as a convenient way of avoiding state law questions.

In conducting that examination, we note that *Burford* did not merely implicate the state regulatory scheme. Rather, Sun Oil challenged the underlying structure of the scheme under the state statute. As the Sixth Circuit has summarized this point, "[b]ecause *Burford* abstention is concerned with potential disruption of a state administrative scheme, rather than the mere existence of such a scheme, looking behind the action to determine whether it implicates the concerns of *Burford* is necessary." *AmSouth Bank v. Dale*, 386 F.3d 763, 784 (6th Cir. 2004). Therefore, "[w]hile district courts may abstain to

avoid interfering with complex state administrative processes, [*Burford*] abstention is not required 'whenever there exists such a process, or even in all cases where there is a "potential for conflict" with state regulatory law or policy.' " *City of Tucson v. U.S. West Communications, Inc.*, 284 F.3d 1128, 1133 (9th Cir. 2002) (quoting *New Orleans Pub. Serv., Inc. v. Council for New Orleans*, 491 U.S. 350, 362 (1989)).

*Burford* also emphasized that the legal dispute from which the Fifth Circuit should have abstained was a dispute over a question of Texas law, so that the Texas state courts were in the best position to resolve legal questions concerning the Railroad Commission. *See, e.g.*, 319 U.S. at 325. *Burford* did not present a case, such as this one, where the application of one state's substantive law was argued to interfere with another state's regulatory policy. *See Prop. & Cas. Ins. Ltd.*, 936 F.2d at 322 n.5 ("[I]t makes no sense to abstain so that a Nebraska court can decide questions of *Illinois* law. Abstaining in favor of Illinois state courts would also seem inappropriate; the underlying issues require only basic principles of contract interpretation and do not implicate the concerns that the Supreme Court relied upon in *Burford*.").[9]

---

[9]*Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25 (1959), supports this conclusion. *Thibodaux* sustained abstention in an eminent domain case that was removed to federal court on the basis of diversity only because "[a] determination of the nature and extent of delegation of the power of eminent domain concerns the apportionment of governmental powers between City and State," *id*. at 28, a state law issue that had not been resolved at the time. The same day as *Thibodaux*, the Supreme Court rejected abstention in a similar eminent domain case, where the state law was clear, largely because the state court was not in a better position to resolve the state-law questions. *See County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 196 (1959); *see also Meredith*, 320 U.S. at 237.

Courts and commentators alike are split on whether *Thibodaux* is a separate abstention doctrine, as opposed to a special form of *Burford* abstention. *See* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1210-11 (5th ed. 2003). Either

### 2.  *Tucker*

*Tucker* was a dispute largely similar to that giving rise to this suit. We held dispositive this last consideration — that the case had initially been brought in a state court different from the one in whose favor abstention was requested.

In *Tucker*, First Maryland Savings & Loan (FMSL) acquired property that it had promised to help Tucker finance, only to default on its obligation. Tucker sued FMSL in Arizona state court for breach of contract, breach of the covenant of good faith and fair dealing, fraud, negligent misrepresentation, and constructive fraud. FMSL removed the case to federal court on the basis of diversity jurisdiction. As the dispute evolved, FMSL was placed into receivership proceedings in Maryland state court. *See Tucker*, 942 F.2d at 1403-04. The district court ruled that abstention was warranted, relying on both *Burford* and *Colorado River*.[10]

[7] We reversed, however, finding neither basis for abstention appropriate:

way, the implication of *Thibodaux* and *County of Allegheny* is that abstention under *Thibodaux/Burford* in cases removed to federal court is inappropriate when the state court from which the case was removed is in no better position to protect the state interests arguably impaired by the exercise of federal jurisdiction.

[10]The theory underlying "*Colorado River* abstention" (which, as we have suggested, is not technically an "abstention" doctrine, *see Holder v. Holder*, 305 F.3d 854, 867 n.4 (9th Cir. 2002)), is that:

> there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."

*Colo. River*, 424 U.S. at 817 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)) (alteration in original).

In finding the principles of *Burford* applicable to this case, the district court stated that the "statute[s] set forth a pervasive scheme designed to coordinate actions against savings and loan institutions in Maryland that are involved in receivership proceedings." There can be no doubt that this legislation evinces Maryland's intent to control the rehabilitation and liquidation of its insolvent savings and loan associations. We also recognize that this is a matter of substantial state concern. We cannot agree, however, with the district court's conclusion that the principles of *Burford* should apply in this case to require the federal court in Arizona to abstain from hearing Tucker's suit.

Initially, Tucker brought this suit in Arizona state court alleging numerous counts arising out of a loan agreement between the parties to acquire and develop property located in Maricopa County, Arizona. He sought the imposition of a constructive trust on the parcel of property known as Turf Village, as well as compensatory and punitive damages, attorneys' fees and costs. Subsequently, the action was removed to the United States District Court for the District of Arizona, based on diversity of citizenship jurisdiction. There are no federal questions involved in this litigation. Further, it is undisputed by the parties that the federal district court, sitting in diversity, would apply the substantive law of Arizona. Thus, *the federal court would sit in the same posture as the Arizona state court and there should be no different result in the federal proceedings than would have been achieved in the state court proceeding*. If abstention were to apply in this case, in effect, the Maryland procedure for liquidating the savings and loan would preclude an action brought in the State of Arizona, in which the applicable substantive law would be Arizona state law. Thus, we do not

have the normal type of abstention whereby a federal court defers to the state law in which it sits. Instead, we have, in effect, a federal court sitting in the same posture as a state court deferring to another state proceeding.

*Tucker*, 942 F.2d at 1406-07 (alteration in original) (emphasis added) (footnote omitted). Distinguishing the case before it from the Fourth Circuit's decision in *Brandenburg v. Seidel*, 859 F.2d 1179 (4th Cir. 1988), *Tucker* emphasized that

we do not have a situation whereby permitting Tucker to proceed with his Arizona state causes of action would circumvent and therefore directly interfere with Maryland's comprehensive scheme for liquidation. . . . [R]esolution of this dispute under Arizona law [will not] interfere with Maryland's statutory scheme in a manner that would implicate the concerns and principles contemplated by *Burford*. Rather than losses suffered because of FMSL's mismanagement and misappropriation of depositor assets, Tucker is merely seeking redress for a claimed violation of a contract for a loan entered into with FMSL. In short, Tucker's claim does not directly relate to depositor assets of an insolvent savings and loan as did the RICO action in *Seidel*.

942 F.2d at 1406 n.3.[11] As *Tucker* concluded, *"Burford*

---

[11] *Seidel* concerned whether federal courts should abstain from deciding questions of Maryland law raised in a damages suit brought by depositors of an insolvent Maryland bank in a Maryland federal district court. It thus differed from this case and *Tucker* in two pertinent respects: First, it was initially filed in federal court, and it was the party that did not invoke federal jurisdiction that was seeking abstention. Second, the state court in which the case would have otherwise been brought was in the same state in which the insolvency proceeding was pending, so no issues of interstate reciprocity regarding insolvency proceedings were raised. Moreover, *Seidel* was not a breach-of-contract action, but a civil RICO and damages suit arising directly out of the bank's insolvency. *See Seidel*, 859 F.2d at 1191-92; *post* at 11365 n.12.

abstention is designed to limit federal interference with the development of state policy. It is justified where the issues sought to be adjudicated in federal court are primarily questions regarding that state's laws. This simply is not the situation before us . . . ." *Id.* at 1407.

*Tucker* also explained why abstention under *Colorado River* was inappropriate. Emphasizing the extent to which *Colorado River* abstention was based on the notion of concurrent jurisdiction over identical causes of action, the court concluded:

> While the special Maryland court has assumed jurisdiction over FMSL's assets through the receivership proceeding, there is no concurrent state proceeding as contemplated by *Colorado River* or subsequent cases applying that doctrine. Tucker brought suit alleging violations by FMSL of various rights based on state contract, tort and constructive trust theories. There is no proceeding pending in Maryland that is attempting to resolve these claims. Instead, there was a case filed in an Arizona state court that was removed to federal court on the basis of diversity jurisdiction alone. This cause of action is the only one pending and the parties do not dispute that Arizona law controls. We can see no reason why Tucker should not be permitted to proceed with these claims against FMSL in Arizona state court. Thus, this case appropriately can be decided by the federal district court sitting in that state.

*Id.* at 1408 (footnote omitted).

Reliance argues against application of *Tucker* to the facts of this case, maintaining that "unlike *Tucker*, this action involves a direct attack against the assets of an insolvent insurance company ordered into liquidation and subject to Pennsylvania's insolvency scheme." But *Tucker* did not turn

on the impact, or lack thereof, that Tucker's suit would have on FMSL's assets. It, too, was a suit for damages, and the only means of eventually recouping those damages was from FMSL's assets. Rather, as *Tucker* emphasized, *Burford* abstention was only appropriate when the suit would impact and unduly burden the state regulatory scheme, distinguishing *Seidel*, the case on which Reliance relies, on that ground. *See, e.g.*, 942 F.2d at 1406 n.3.

[8] *Tucker* thus squarely forecloses Reliance's abstention arguments. Unlike the paradigmatic *Burford* and *Colorado River* cases, but like *Tucker*, the federal suit here concerns a state-law contract dispute that will have to be resolved under California law. Adjudication of the pertinent issues of California law, including California law concerning whether to defer to insurance insolvency proceedings in other states, will not entail any more *federal* intrusion into state policy or *federal* disruption of a state regulatory scheme than in any other diversity case.[12] We are not asked to resolve questions of Pennsylvania law that may directly implicate the Pennsylvania liquidation scheme. Whether California law should be read in such a manner that requires courts applying it to defer to the Pennsylvania liquidation proceedings is a question that does not implicate principles of *Burford* abstention. Because we find the other circuits' decisions requiring abstention on similar facts inapposite or unpersuasive,[13] and because we

---

[12]In addition to the grounds noted earlier as to why *Tucker* and *Seidel* presented different issues, we note that unlike *Tucker*, *Seidel* was a case where *federal* law — specifically, the civil remedy provision of the RICO statute, 18 U.S.C. § 1964 — was invoked in federal court to litigate claims against an insolvent savings and loan association. *See Seidel*, 859 F.2d at 1192. *Seidel* thus presented a case much more directly raising *Burford* federalism concerns than either this case or *Tucker*, and, as noted above, the Fourth Circuit relied at least in part on the extent to which the federal action was an attempt to circumvent the state regulatory proceeding. *See id.*

[13]Several of our sister circuits' decisions endorsing *Burford* abstention with regard to state-court insolvency proceedings concern the type of

review the district court's decision *not* to abstain for an abuse of discretion, *see ante* at 11356 n.8, we hold that the district court's refusal to abstain was not an abuse of discretion.

### C.  Full Faith and Credit

Reliance next argues that the district court should have accorded full faith and credit to the stay contained in the Pennsylvania Commonwealth Court's rehabilitation and liquidation orders. The relevant provision of the liquidation order provides that:

---

intra-state claim — a federal court applying the law of the state in which the liquidation proceedings are ongoing — that, as *Tucker* explained, more directly implicates *Burford*. *See, e.g.*, *Grimes*, 857 F.2d 699.

Only two of the decisions by our sister circuits appear to abstain on facts analogous to those here. In *Martin Insurance Agency, Inc.*, 910 F.2d 249, the Fifth Circuit improperly rested on *Grimes*, a case that, as explained, more directly implicates *Burford*. *Lac D'Amiante du Quebec, Ltee.*, 864 F.2d 1033, on which the Fifth Circuit also relied, assumed that *Burford* is appropriate in cases seeking only declaratory relief, a conclusion cast into doubt by the Supreme Court's later decision in *Quackenbush*, and fails adequately to consider, in any event, the extent to which the New York liquidation scheme was actually disrupted by the suit at issue. *See, e.g.*, *id.* at 1045-48. More recently, the Third Circuit refused to abstain under *Burford* on facts more closely related to those presented here:

> Although the regulation of insolvent insurance companies is surely an important state interest, this case does not involve the complex and highly regulated issues of insurance regulation; rather, it is a simple contract action involving an allegedly unpaid debt. The complex regulations relating to insolvent insurance companies have to do with plans of rehabilitation and payment to policy holders. Simple contract and tort actions that happen to involve an insolvent insurance company are not matters of important state regulatory concern or complex state interests.

*Grode v. Mut. Fire, Marine & Inland Ins. Co.*, 8 F.3d 953, 959 (3d Cir. 1993) (footnote omitted).

> Unless the liquidator consents thereto in writing, no action at law or equity, or arbitration or mediation, shall be brought against Reliance or the Liquidator, whether in this Commonwealth or elsewhere, nor shall any such existing action be maintained or further prosecuted after the date of this Order. All actions, including arbitrations and mediations, currently pending against Reliance in the courts of the Commonwealth of Pennsylvania or elsewhere are hereby stayed.[14]

Reliance argues that a California court would have to give full faith and credit to such orders, and that the district court therefore should have done so as well. This argument fails, however, whether one views the question from the perspective of the obligations owed by the courts of one state regarding judgments issued by the courts of another, or from the perspective of a federal court's full faith and credit obligation.

[9] First, both interstate and state-federal full faith and credit principles concern the enforceability of judgments, and therefore incorporate otherwise applicable limitations on enforceability. Thus, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter *and* persons governed by the judgment, qualifies for recognition throughout the land." *Baker ex rel. Thomas v.*

---

[14]Along similar lines, the rehabilitation order filed on May 29, 2001, provided that:

> All persons, in the Commonwealth or elsewhere, are enjoined and restrained from: (a) instituting or further prosecuting any action in law or equity against Reliance or the Rehabilitator; (b) obtaining preferences, judgments, attachments, garnishments or liens, including obtaining collateral in any litigation, mediation, or arbitration involving Reliance, the Rehabilitator, or Reliance's assets and property; (c) levying any execution process against Reliance, the Rehabilitator or Reliance's assets and property in the Commonwealth of Pennsylvania or elsewhere; and (d) making any assessments or indirectly collecting such assessments by setting them off against amounts otherwise payable to Reliance.

*Gen. Motors Corp.*, 522 U.S. 222, 233 (1998) (emphasis added);[15] *see also Underwriters Nat'l Assurance Co. v. N.C. Life & Accident & Health Ins. Guar. Ass'n*, 455 U.S. 691, 711 (1982) (emphasizing that decisions rendered by an Indiana rehabilitation court were entitled to full faith and credit in North Carolina because "the Rehabilitation Court had personal jurisdiction over all parties necessary to its determination that the North Carolina Association could not satisfy pre-rehabilitation claims out of the North Carolina deposit"); *id.* at 716-17 (White, J., concurring in the judgment) (agreeing with the majority that the rehabilitation court "had jurisdiction over the Association because, as the majority opinion amply demonstrates in Part I, the Association appeared before the court as a party and participated in the Rehabilitation Plan"). We have read *Baker* as reiterating "that one state's judgment cannot be used to control litigation in other courts absent both parties having been before the court in both litigations." *Taylor v. Sawyer*, 284 F.3d 1143, 1153 (9th Cir. 2002) (citing Baker, 522 U.S. at 239).[16]

---

[15]Although the Court was divided in other respects in *Baker*, a majority was persuaded that the absence of in personam jurisdiction precluded requiring a Missouri court to accord full faith and credit to a Michigan injunction. *See, e.g.*, 522 U.S. at 238 ("Michigan's judgment . . . cannot reach beyond the Elwell-GM controversy to control proceedings against GM brought in other States, by other parties, asserting claims the merits of which Michigan has not considered. Michigan has no power over those parties . . . ."); *id.* at 247 (Kennedy, J., concurring in the judgment) ("The simple fact is that the Bakers were not parties to the Michigan proceedings, and nothing indicates Michigan would make the novel assertion that its earlier injunction binds the Bakers or any other party not then before it or subject to its jurisdiction.").

[16]This understanding reflects the deeper principle underlying full faith and credit analysis, that full faith and credit concerns "do[ ] not . . . enable one state to legislate for the other or to project its laws across state lines so as to preclude the other from prescribing for itself the legal consequences of acts within it." *Pac. Employers Ins. Co. v. Indus. Accident Comm'n of Cal.*, 306 U.S. 493, 504-05 (1939); *see also McElmoyle ex rel. Bailey v. Cohen*, 38 U.S. (13 Pet.) 312, 325 (1839).

**[10]** Hawthorne was never a party to the Pennsylvania pro-
ceedings, nor does Reliance argue that the Commonwealth
Court on any other basis had personal jurisdiction over Haw-
thorne. Although "state proceedings need do no *more* than
satisfy the minimum procedural requirements of the Four-
teenth Amendment's Due Process Clause in order to qualify
for the full faith and credit guaranteed by federal law,"
*Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 481 (1982)
(emphasis added), they can do no less, either. We therefore
will not extend full faith and credit to the rehabilitation and
liquidation orders, because the Commonwealth Court lacked
in personam jurisdiction over Hawthorne in the proceedings
in which the orders were issued.[17]

**[11]** Moreover, even if the jurisdictional prerequisites were
satisfied, and even assuming that the anti-suit injunction in the
liquidation order is a "judgment" entitled to full faith and
credit, a point we do not decide,[18] state courts may never

---

[17]It is also debatable whether the Commonwealth Court had subject-
matter jurisdiction under Pennsylvania law to issue an anti-suit injunction
intended to have force outside Pennsylvania. *See, e.g.*, *Robbins v. Reliance
Ins. Co.*, 102 S.W.3d 739, 744-45 (Tex. App. 2001) (holding that the Reli-
ance rehabilitation order was, to the extent it enjoined out-of-state litiga-
tion, beyond the Commonwealth Court's jurisdiction). The Pennsylvania
statutory structure supports the Texas Court of Appeals' decision. *Com-
pare, e.g.*, 40 PA. CONS. STAT. § 221.5(a) (prescribing the Commonwealth
Court's jurisdiction), *with id*. § 221.5(b) ("The *receiver* may apply to any
court outside of the Commonwealth for the relief described in subsection
(a) . . . ." (emphasis added)), *and id*. § 221.17(a) ("The *rehabilitator* shall
immediately consider all litigation pending outside this Commonwealth
and shall petition the courts having jurisdiction over that litigation for
stays whenever necessary to protect the estate of the insurer." (emphasis
added)). We need not resolve this issue, however, as the clear absence of
in personam jurisdiction is sufficient, for our purposes, to defeat Reli-
ance's claim to full faith and credit.

[18]The Pennsylvania liquidation proceeding was not concluded at the
time that the rehabilitation and liquidation orders issued. Moreover, the lit-
igation stay here invoked did not determine the merits issues at stake in
the present litigation. It is not clear that the stay orders are sufficiently

enjoin in personam proceedings in the federal courts. *See* Erwin Chemerinsky, Federal Jurisdiction § 11.2.1, at 717 n.10 (4th ed. 2003) ("[T]he only time that state courts can enjoin federal proceedings is when the state courts first acquire in rem or quasi in rem jurisdiction before the federal courts."); *Donovan v. City of Dallas*, 377 U.S. 408, 412-13 (1964) (reiterating the "old and well-established judicially declared rule that state courts are completely without power to restrain federal-court proceedings in *in personam* actions" (footnote omitted)); *see also Baker*, 522 U.S. at 236 n.9.

This last point is independently sufficient to defeat Reliance's full faith and credit argument. Hawthorne's suit is an in personam proceeding[19] and the rule barring states from enjoining in personam actions in the federal courts applies with equal force regardless of the basis for federal jurisdiction. *See, e.g.*, *Duchek v. Jacobi*, 646 F.2d 415, 419 & n.4 (9th Cir. 1981) (relying on *Donovan* in a diversity case). We therefore agree with the Tenth Circuit that "[t]he argument that a state court could in effect enjoin a person from proceeding further in an action previously instituted in a federal court where the federal court admittedly has jurisdiction of both subject matter and the parties is a bit startling and finds no

---

"final" adjudications of the pertinent issues to merit respect under the Full Faith and Credit Clause. *See, e.g.*, *McInnes v. California*, 943 F.2d 1088, 1092-93 (9th Cir. 1991); *see also Sutton v. Leib*, 342 U.S. 402, 407 (1952) (citing *Riley v. N.Y. Trust Co.*, 315 U.S. 343, 348-49 (1942)). Because we ultimately conclude that the orders are not entitled to full faith and credit in any event, we assume, without deciding, that they are "final."

[19]*See, e.g.*, R.H. Graveson, Conflict of Laws 98 (7th ed. 1974):

An action is said to be *in personam* when its object is to determine the rights and interests of the parties themselves in the subject-matter of the action, however the action may arise, and the effect of a judgment in such an action is merely to bind the parties to it. A normal action brought by one person against another for breach of contract is a common example of an action *in personam.*

sanction in the law." *Aluminum Prods. Distribs., Inc. v. Aaacon Auto Transp., Inc.*, 549 F.2d 1381, 1383 (10th Cir. 1977).

**[12]** We conclude that the liquidation and rehabilitation orders issued by the Commonwealth Court are not entitled to full faith and credit in this litigation.

## D. Comity

Reliance also argues that general principles of comity required the district court to dismiss this suit.

**[13]** "Under the principles of comity, federal courts of equity should exercise their discretionary power with proper consideration for the independence of state government in carrying out its governmental functions. However, comity is a doctrine of discretionary abstention." *City & County of San Francisco v. Assessment Appeals Bd. for the City & County of San Francisco, No. 1*, 122 F.3d 1274, 1277 (9th Cir. 1997) (citing *Freehold Cogeneration Assocs. v. Bd. of Regulatory Comm'rs*, 44 F.3d 1178, 1187 n.6 (3d Cir. 1995)). It is not clear to what extent comity remains an independent basis for abstention, available even when none of the settled comity-based abstention doctrines such as *Burford* and *Colorado River* apply. Further, as we held in *Assessment Appeals Board*, where, as here, a case was originally filed in state court, comity would only warrant a remand to state court.

**[14]** Assuming, however, that we could create some new, free-floating, comity-based abstention doctrine for cases of this ilk, it could not apply in this case. As the Supreme Court has made clear, "principles of comity and federalism do not require that a federal court abandon jurisdiction it has properly acquired simply because a similar suit is later filed in a state court." *Town of Lockport v. Citizens for Cmty. Action at the Local Level, Inc.*, 430 U.S. 259, 264 n.8 (1977). Here, the federal action was already pending at the time the rehabilitation and liquidation orders were filed. The district court there-

fore did not violate principles of comity by continuing to exercise jurisdiction over this suit.

### III.   Application of State Law

Although the court in *Tucker* found abstention inappropriate, its decision stopped there, reversing the district court's abstention decision and remanding for further proceedings. *Tucker* never reached the central issue to be decided in a case such as this one: What *would* a state court do under the Uniform Insurers Liquidation Act (UILA), CAL. INS. CODE §§ 1064.1-.12, were it in our position? As the district court here proceeded to judgment, we need to determine that question.

[15] Under California law, whether California state courts must defer to rehabilitation and liquidation proceedings commenced in Pennsylvania turns largely — but, critically, not entirely — on whether Pennsylvania is a "reciprocal state" under the terms of the UILA.[20] As provided by section 1064.9 of the California Insurance Code, which mirrors section 9 of the UILA, "[d]uring the pendency of delinquency proceedings in this or any reciprocal state, no action or proceeding in the nature of an attachment, garnishment, or execution shall be commenced or maintained in the courts of this state against the delinquent insurer or its assets."

Whether Hawthorne's suit is the kind of action barred by section 1064.9 is pertinent only if Pennsylvania is a reciprocal state. No similar statutory provision exists barring courts in UILA states from exercising jurisdiction when the delinquency proceedings are ongoing in a non-reciprocal state. *Cf.*

---

[20]As the New York Court of Appeals has explained, "the Uniform Insurers Liquidation Act was adopted with the main purpose in mind of providing a uniform system for the orderly and equitable administration of the assets and liabilities of defunct multistate insurers." *G.C. Murphy Co. v. Reserve Ins. Co.*, 429 N.E.2d 111, 115 (N.Y. 1981).

*Lewis, Roca, Scoville & Beauchamp v. Inland Empire Ins. Co.*, 259 F.2d 318, 320 (10th Cir. 1958).

Before resolving whether Pennsylvania is a reciprocal state under the California UILA, we begin with two important predicates — the definition of "reciprocal state" under the California UILA, and the observation that Pennsylvania has never formally adopted the UILA.

In its entirety, California law defines a "reciprocal state" as

> any state other than this state in which *in substance and effect the provisions of this act are in force*, including the provisions requiring that the commissioner or equivalent insurance supervisory official be the receiver of a delinquent insurer. A "reciprocal state" *includes* any state also which has, through its commissioner or equivalent supervisory official, entered into a binding and enforceable written agreement with the commissioner of this state which provides that (1) a commissioner or equivalent supervisory official is required to be the receiver of a delinquent insurer; (2) title to assets of the delinquent insurer shall vest in the domiciliary receiver, as of the date of any court order appointing him or her as receiver, and he or she shall have the same rights to recover those assets as provided under subdivision (b) of Section 1064.3; (3) nondomiciliary creditors may file and prove their claims before ancillary receivers; (4) the laws of the domiciliary state of the delinquent insurer shall be applied uniformly to residents and nonresidents in the allowance of preference of claims, except for claims to special deposits created under the laws of the domiciliary state; (5) preferences (including attachments, garnishments, and liens) for creditors with advance information shall be prevented; and (6) the domiciliary receiver may sue in the reciprocal state to

recover any assets of a delinquent insurer to which he or she may be entitled under the law.

CAL. INS. CODE § 1064.1(f) (emphasis added). The six provisos in the definition have elsewhere been described as the "six central remedies" of the UILA. *See Twin City Bank v. Mut. Fire Marine & Inland Ins. Co.*, 646 F. Supp. 1139, 1141 & n.5 (S.D.N.Y. 1986) (citing *Kelly v. Overseas Investors, Inc.*, 264 N.Y.S.2d 586, 591 (App. Div. 1965)), *aff'd without opinion*, 812 F.2d 713 (2d Cir. 1987).

Unlike California, Pennsylvania has not expressly adopted the UILA. Courts in various UILA states have split on the question whether Pennsylvania is nonetheless a reciprocal state under that state's law, although the weight of authority is that the answer is "yes."[21] Nor is there any published California state court opinion concerning whether Pennsylvania is a reciprocal state. We therefore must resolve this issue without guidance from the California courts. *See Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) ("When interpreting state law, federal courts are bound by decisions of the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." (internal quotation marks omitted)).

---

[21] *See, e.g.*, *Massey v. Town of Windsor*, 289 F. Supp. 2d 160, 166 (D. Conn. 2003); *Reliance Nat'l Indem. Co. v. Pinnacle Cas. Assurance Corp.*, 160 F. Supp. 2d 1327, 1333-34 (M.D. Ala. 2001); *Twin City Bank*, 646 F. Supp. at 1141-42; *Gruber v. Caremark, Inc.*, 853 So. 2d 540, 542 (Fla. Dist. Ct. App. 2003); *All Star Adver. Agency, Inc. v. Reliance Ins. Co.*, 898 So. 2d 369, 382-83 (La. 2005). Only a handful of courts have concluded to the contrary. *See, e.g.*, *Reliance Ins. Co. v. Plumb Creek Timber Co., L.P.*, No. 99C-11-263, 2001 WL 1222090 (Del. Super. Sept. 26, 2001) (unpublished); *All Star Adver. Agency, Inc. v. Reliance Ins. Co.*, 871 So. 2d 371, 374 (La. Ct. App. 2004), *rev'd*, 898 So. 2d 369; *cf. Kirkland v. Legion Ins. Co.*, 343 F.3d 1135, 1141 (9th Cir. 2003) (refusing to reach whether Pennsylvania is a reciprocal state under Oregon law).

We begin with the text of section 1064.1(f). That text makes a formal agreement sufficient, but not necessary, for reciprocal status. *See* CAL. INS. CODE § 1064.1(f) ("A 'reciprocal state' *includes* any state *also* which has, through its commissioner or equivalent supervisory official, entered into a binding and enforceable written agreement with the commissioner of this state . . . ." (emphases added)).

**[16]** The relevant inquiry, consequently, is whether Pennsylvania law provides for the six central remedies of the UILA. *See Twin City Bank*, 646 F. Supp. at 1141 & n.5; *see also All Star Adver. Agency*, 898 So. 2d at 375-83 (exhaustively analyzing whether Pennsylvania law today so provides). Like the district court in *Twin City Bank* and the Louisiana Supreme Court in *All Star Advertising Agency*, we conclude, on reviewing the six prerequisites for reciprocal recognition, that Pennsylvania's law incorporates each of them "in substance and effect."

**[17]** As *Twin City Bank* recounted, Pennsylvania law provides: (1) that the insurance commissioner shall serve as receiver, *see* 40 PA. CONS. STAT. §§ 221.12, 221.15, 221.20; (2) authority for domiciliary receivers to proceed in non-domiciliary states, *see id.* § 221.55; (3) for vesting of title to assets in the domiciliary receiver, *id.* § 221.20; (4) for non-domiciliary creditors to have the option to proceed with claims before local ancillary receivers, *see id.* § 221.58; (5) for uniform application of the laws of the domiciliary state to the allowance of preferences among claims, *see id.* § 221.61; and (6) for prevention of preferences for diligent non-domiciliary creditors with advance information, *see id.* § 221.17. *Twin City Bank*, 646 F. Supp. at 1141. The California Supreme Court would therefore hold that Pennsylvania is a reciprocal state under California law.

**[18]** Despite that conclusion, we are convinced that section 1064.1(f) does not bar the district court's exercise of jurisdiction. On this point, we find persuasive, given the absence of

any pertinent California precedent, the cases from two state supreme courts: the Supreme Court of Wyoming's decision in *Hoiness-LaBar Insurance v. Julien Construction Co.*, 743 P.2d 1262 (Wyo. 1987), and the Supreme Court of Minnesota's decision in *Fuhrman v. United America Insurors*, 269 N.W.2d 842 (Minn. 1978). Both *Hoiness-LaBar* and *Fuhrman* held that reciprocity does not apply to the determination of in personam legal rights, as opposed to the enforcement of any resulting judgment against the estate of an insolvent company in state court proceedings.

In *Hoiness-LaBar*, the Wyoming Supreme Court was confronted with a breach-of-contract suit filed by a general contractor against his insurer. The insurer was subsequently placed into receivership proceedings in Indiana. Although both Indiana and Wyoming had adopted the UILA, and Indiana was therefore a "reciprocal state," the Wyoming Supreme Court rejected the argument that the UILA barred the lawsuit:

> A careful reading of the above-quoted statute reveals that the uniform act enjoins the enforcement of a judgment through attachment, garnishment or execution proceedings. The act does not, however, prohibit a party from maintaining an action to obtain a judgment, or prohibit a court from entering a judgment. *The act only prohibits actions to enforce or collect on a judgment*. The receivership proceeding in Indiana is more properly an issue affecting the collectability and enforceability of any Wyoming judgment. The uniform act does not contemplate the discontinuance of an action to obtain a judgment underway in Wyoming.

*Hoiness-LaBar*, 743 P.2d at 1268-69 (emphasis added).

Along similar lines, the Minnesota Supreme Court, in *Fuhrman*, held that it need not defer resolution of a declara-

tory judgment contract action in favor of receivership proceedings commenced in Iowa. As the court emphasized:

> not every suit brought against a receivership defendant is deemed to interfere with the res. The distinction is commonly made between the liquidation of a claim and the enforcement of the claim after it has been reduced to judgment. Thus, an action in personam to establish the extent of an insolvent's liability on a claim is held not to interfere with the receivership res. By the same token, any attempted attachment or levy against the res made in connection with a judgment is normally in rem and directly opposed to the court's dominion over the res. Accordingly, an in personam action against the receivership defendant need not be brought in the receivership court.

*Fuhrman*, 269 N.W.2d at 846 (citations omitted).

The text of the UILA manifests this principle. In specifying that "no action or proceeding *in the nature of an attachment, garnishment, or execution*" may be maintained, CAL. INS. CODE § 1064.9 (emphasis added), the language suggests that an "action or proceeding" may be maintained *unless* it is "in the nature of an attachment, garnishment, or execution."

Only one court appears to have taken a directly contrary view. *See Ex parte United Equitable Life Ins. Co.*, 595 So. 2d 1373 (Ala. 1992). As the Alabama Supreme Court explained:

> Provision 6 of the rehabilitation order restricts all officers and employees from paying any claims obligations to United's policyholders. Although this does not specifically prohibit the issuance of a judgment against United, the issuance of a judgment would undermine the very policy that the [Alabama UILA] is based on. If this case were litigated and the [plaintiffs] obtained a judgment against United for

the amount due under their policy, the judgment would give them priority for payment over others holding insurance contracts with United. The AUILA is meant to protect the interests of all policy-holders until the company either becomes financially solvent again or some other form of action is taken. Therefore, until the Illinois court makes further determinations, the assets of United must remain neutral.

*Id.* at 1375. The Alabama Supreme Court did not explain, however, why the plaintiffs would have priority for payment in the liquidation proceedings if all they had was a claim reduced to judgment. Whether that is so would be a matter for the court in which liquidation proceedings are pending; nothing in the bare existence of a judgment would interfere with the forum court's resolution of priority issues. Pennsylvania law has long established that judgment creditors are not entitled to such priority. *See Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 614 A.2d 1086, 1101 (Pa. 1992); *see also Davis v. Commonwealth Trust Co.*, 7 A.2d 3, 5-6 (Pa. 1939).

The purpose of the UILA is to bar claimants from directly interfering with liquidation proceedings. Allowing suits such as Hawthorne's to go to judgment does not implicate this underlying principle. We believe this reading of California law is the most faithful to the California statute and is that which the California Supreme Court would adopt.

**[19]** We therefore hold that, although Pennsylvania is a reciprocal state under the UILA for purposes of California law, a California state court would not stay its proceedings under the UILA but would decide the merits of this dispute, as did the district court.

## IV.   The Litigation Bond

Independent of its argument that this case should have been stopped in its tracks entirely, Reliance challenges the propri-

ety of the district court's order requiring it to post a $1.1 million litigation bond.

As we explained in *O'Malley Lumber Co. v. Lockard* (*In re Lockard*), 884 F.2d 1171 (9th Cir. 1989), albeit in the context of a bankruptcy proceeding, there is a critical difference in insolvency proceedings between a bond and a cash deposit:

> In the case of a cash deposit, the contractor puts up his own property to guarantee his performance on commercial or personal services contracts. By contrast, a contractor who instead posts a bond interposes a third-party surety between himself and contract claimants; the surety essentially agrees, in exchange for the contractor's promise of indemnification or, as here, a lien on the contractor's assets, to pay the claims of contract creditors out of the surety's own funds in an aggregate amount up to the limits of the bond in the event of the contractor's breach.

> The basic difference is in the party, the contractor or the surety, who puts its property directly at risk of liability to creditors in the event of nonpayment by the contractor. . . . [A] fundamental purpose of bankruptcy proceedings is to "throw a blanket of protection on all of the property of the debtor." In the usual case it is unnecessary, and would be unfair to creditors, similarly to shelter the property of sureties who have undertaken obligations for the benefit of those creditors.

*Id.* at 1178 (citation omitted); *see also United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1492 (9th Cir. 1993).

Reliance initially moved for a stipulation authorizing it to post cash in lieu of a bond, to which Hawthorne objected. The district court agreed with Hawthorne and ordered a bond

posted. Shortly thereafter, but before any rehabilitation or liquidation proceedings were commenced in Pennsylvania, Reliance posted the indemnity bond in the amount of $1.1 million. The bond provides that: "[t]he Insurance Company of the State of Pennsylvania, hereby obligates itself to [Hawthorne], to pay an amount not exceeding the sum of [$1.1 million] to satisfy any final judgment which may be rendered in such action against Reliance Insurance Company, as successor-in-interest by merger to Reliance Insurance Company of Illinois."

The propriety of the bond turns on the answers to two questions: (1) Does the bond violate the UILA as codified in the California Insurance Code? (2) If not, did the district court have discretion to require the bond under California law?[22]

The answer to the first question is "no." The bond is not an asset of Reliance. The order requiring the bond is thus not attaching, garnishing or executing on any asset of Reliance. While the bonding company may have required that Reliance post security to obtain the bond, the transaction between the bonding company and Reliance was not the subject of any order by the district court. Only if the bond-holder, the Insurance Company of the State of Pennsylvania, were to com-

---

[22]Hawthorne argues that Reliance is collaterally estopped from challenging the propriety of the bond because of the rulings of the Central District bankruptcy court in *First Alliance Mortgage Co. v. Reliance Insurance Co. of Illinois*, Adv. Case No. 00-01538 (Bankr. C.D. Cal.). We disagree. Unlike this case, where the bond was ordered against Reliance, there, the bond was originally ordered against Reliance of Illinois. Although the bankruptcy court subsequently reaffirmed the bond after the merger, we cannot tell whether it would have arrived at the same result ab initio. That factual difference, given that Reliance was admitted in California but Reliance of Illinois was not, renders collateral estoppel on the legal issue inappropriate. *See, e.g.*, *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997) ("Collateral estoppel is inappropriate if there is any doubt as to whether an issue was actually litigated in a prior proceeding." (quoting *Eureka Fed. Sav. & Loan Ass'n v. Am. Cas. Co. of Reading, Pa.*, 873 F.2d 229, 233 (9th Cir. 1989))).

mence an action to collect on any collateral securing the bond would section 9 of the UILA, as codified at California Insurance Code section 1064.9, be implicated and preclude California courts from entertaining the collection action. The current proceedings, however, do not involve any such collection action.

**[20]** Even if the bond is not barred under the California UILA, however, there is still the outstanding question as to the district court's authority under applicable state law to require the bond. The relevant provision is section 1616 of the California Insurance Code. It provides:

> Before any nonadmitted foreign or alien insurer shall file or cause to be filed any pleading in any action, suit or proceeding instituted against it, the insurer shall either (1) procure a certificate of authority to transact insurance in this state; or (2) give a bond in the action, suit or proceeding in an amount to be fixed by the court sufficient to secure the payment of any final judgment which may be rendered in the action, suit, or proceeding.

The critical point, for our purposes, is that this suit is an action filed against a "nonadmitted foreign or alien insurer" — Reliance-Illinois. Although Reliance-Illinois subsequently merged with parent Reliance, we believe that the comprehensiveness of the California statutory scheme supports our reading of section 1616 as turning on the insurer against whom the suit is filed. As we shortly explain, had the suit been filed against the parent Reliance, Hawthorne would have had an alternative means of securing a potential judgment. So construed, the district court did not abuse its discretion in requiring a bond under section 1616.

Under California law, the California Insurance Guaranty Association (CIGA) exists for the sole purpose of providing claimants against insolvent insurance companies with a rem-

edy. Admitted insurers participate in CIGA, in return for which CIGA guarantees "covered claims" against the insurers if they are declared insolvent. *See id.* §§ 1063-1063.15; *see also Cole v. Cal. Ins. Guar. Ass'n*, 18 Cal. Rptr. 3d 801, 804-05 (Ct. App. 2004) (describing the background and structure of CIGA); *R.J. Reynolds Co. v. Cal. Ins. Guar. Ass'n*, 1 Cal. Rptr. 2d 405, 408 (Ct. App. 1991) (same).

As here pertinent, "covered claims" under CIGA include

> the obligations assumed by an assuming insurer from a ceding insurer where the assuming insurer subsequently becomes an insolvent insurer if, at the time of the insolvency of the assuming insurer, the ceding insurer is no longer admitted to transact business in this state. Both the assuming insurer and the ceding insurer shall have been member insurers at the time the assumption was made.

CAL. INS. CODE § 1063.1(c)(2). Because Reliance-Illinois was not a "member insurer" at the time of the merger (a point Reliance does not contest), Hawthorne's claim against Reliance is, without question, not "covered" under CIGA.

In light of the limitations in CIGA's definition of "covered claims," the point of the bond requirement in section 1616 is to secure the claims of parties who purchase insurance from non-admitted insurers and are therefore not within the protection of CIGA's umbrella. Among them, then, CIGA, on the one hand, and the bond requirement in section 1616, on the other, are meant to assure that a party may secure an enforceable judgment against an insolvent insurance company, one way or another.[23] This case falls squarely into a gap between

---

[23]A third option for securing a judgment is the discretionary bond procedures prescribed by California Insurance Code section 1620. That provision, however, applies to specific categories of insurance contracts. The contract here at issue appears to fit into none of those categories. *See id.*

the two schemes — the fund established under CIGA for admitted insurers and the bonds that can be required under section 1616 for non-admitted insurers — solely because of the merger between Reliance-Illinois and Reliance.

**[21]** We conclude that no gap in the protection made available to litigants against insolvent insurance companies was intended. Instead, we believe that construing section 1616 as applying to the insurance company against which the suit is filed is the correct interpretation of California law, and that which we believe the California Supreme Court would adopt. The district court therefore did not abuse its discretion in requiring Reliance to post an indemnity bond.

## V.   The Jury Instruction

Finally, Reliance contends that the district court erred in instructing the jury that the settlement between Bazyler and Hawthorne was presumptively "reasonable." The challenged instruction provided that:

> The plaintiffs were free to negotiate the best possible settlement in the underlying *Bazyler* case consistent with their interests. The settlement in the *Bazyler* case is therefore presumed to be reasonable. The amount of the settlement is also presumed to be reasonable. The effect of the presumption is to shift the burden of proof to defendant to prove that the settlement was unreasonable or the product of fraud or collusion between the plaintiffs and Mr. Bazyler. Defendant must prove by a preponderance of the evi-

§ 1620(a) ("The provisions of the preceding sections of this article [including section 1616] shall not apply to any action, suit or proceeding against any unauthorized foreign or alien insurer arising out of any contract of insurance effected in accordance with Section 1760, 1760.5, 1763, or 1763.1 . . . .").

dence that the amount of the settlement was unreasonable or that it was unreasonable for the plaintiffs to enter into the settlement with Mr. Bazyler.

Reliance's central argument is that Hawthorne was only entitled to the presumption that the Bazyler settlement was reasonable if Reliance "wrongfully refused to defend or settle a claim" — that is, that the presumption only applies where the insurance company has an established duty to defend.

This argument disregards the basic principle that we read jury instructions as a whole to determine whether they are accurate. *See, e.g.*, *White v. Ford Motor Co.*, 312 F.3d 998, 1012 & n.54 (9th Cir. 2002), *as amended*, 335 F.3d 833 (9th Cir. 2003). Read in that manner, the instructions given the jury were perfectly accurate. In the challenged jury instruction, the reasonableness of Hawthorne's settlement with Bazyler went to the appropriate damages in the district court. A necessary predicate to reaching damages was Reliance's liability. As to liability, the jury was instructed that, "[i]f any of the claims in the *Bazyler* case were covered, Reliance had a duty to pay for the Braly defense. . . . Plaintiffs must demonstrate by a preponderance of the evidence that a claim was covered." Only if the jury found for the plaintiffs as to the liability question was the subsequent instruction, quoted above, pertinent. Given the sequence and wording of the instructions, the jury would have so understood.

**[22]** Thus, the jury instructions as a whole did require the jury to conclude that Reliance had a duty to defend, which it did not perform. Once the jury so concluded, Hawthorne was entitled to the presumption that its settlement with Bazyler was reasonable.

## VI.  Conclusion

We conclude that Reliance's jurisdictional and abstention arguments are unavailing. The district court did not err in

requiring a $1.1 million litigation bond, nor in issuing the challenged jury instruction. We therefore **AFFIRM** in all respects in No. 03-55548, and **DISMISS** for failure to prosecute in No. 03-55611.

    **AFFIRMED** in part; **DISMISSED** in part.